As I understand, you've been told our presiding judge is listening in and speaking in from Houston. She's on a panel over there where we occasionally or quite often sit, and so this was a way to make this work out. I see how you have allotted your time. Follow our allotting system. We may have plenty of time, or you may find yourself with more to say than you have time, but you're used to that. It's an important case with important issues in it, so we'll let you get started, Ms. Carroll. Thank you, Your Honor, and may it please the Court, my name is Catherine Carroll and I represent the applicant, Andre Thomas. Your Honor, in our application for a Certificate of Appealability, we've briefed five grounds for relief, but I'd like to focus today, at least initially, on two of those issues. Let me ask you this in the State as well. We're here on a COA, the briefs have been quite thorough, record excerpts have been quite thorough. Is there anything further, were we to grant a COA on one or more issues that you would have to present to us? Certainly, Your Honor, I think that, you know, we do think that the presentation we've put together so far not only warrants a COA, but in fact, relief. I think if we had the opportunity for further briefing, we would welcome that, in part because our briefing thus far has trained, in large measure, on the reasoning of the District Court in order to demonstrate its debatability, whereas, obviously, once the COA is granted, there could be more of a cleaner, narrow focus on the unreasonableness of the State Court's treatment. So I think that that could be useful in that respect, but to address the slightly different standard of review that would apply there. I know that lawyers always like more pages and more time. I'm trying to get a candid answer of whether that's really necessary here in light of all that we've been presented, and I'm not doubting that you gave us a candid answer, but you might. If you can cut us any slack on that, that would be helpful. I do think what we've said is enough to warrant relief, but, of course, we would welcome the opportunity. I'd like to focus, at least initially, with the Court's permission, on two of the issues that we've briefed. First, that the presence of racially biased jurors on the panel violated Mr. Thomas' constitutional rights and the associated failure of counsel to question or challenge those jurors. And second, that counsel utterly failed to conduct a reasonable mitigation investigation in preparation for the punishment phase. Beginning, if I may, with the juror bias issues, as this Court recognized in the Virgil case that we cite in our briefs, it's clearly established federal law that a criminal defendant has a constitutional right to an impartial jury, and that the presence of even one biased juror constitutes structural error that taints any resulting conviction with constitutional infirmity. Here — Well, Virgil is a very clear case, it seems to me, where two venerymen, ultimately jurors, said that they were not sure of the terminology in light of relationship with law enforcement, crime victim in the family. What we have here is sort of a step removed, it seems. There was a — there were jurors who were opposed to interracial marriage. The only one who was actually quizzed on would that affect — if an African-American married to a white person was in this case, how would that affect your ability to judge him and the facts, and, you know, an answer was given, and the others weren't pursued that way. But it seems to me we don't have — we have disagreement with a lifestyle choice. What's your best case to say this sort of belief is the kind of racial prejudice that the case law is talking about that would fit within that category? I would point to Loving v. Virginia, Your Honor, where the Supreme Court's decision regarding the unconstitutionality of anti-miscegenation laws, which recognized that statements of the type here, which is to say not just checking a box about opposition, but the volunteered explanations that these veneer members gave for why they had those views. So, for example, Juror Copeland, who Your Honor correctly notes was never questioned at all, went on to explain that his reason for opposing the marriages was grounded in his view that the bloodlines shouldn't be mixed. Juror Armstrong, who similarly was never questioned, went on to explain that she was concerned that any children that came out of such a relationship would not have a specific race to belong to, and, of course, Juror Ulmer, who was the juror who was questioned, went on to explain that interracial relationships were contrary to God's intent. Those are precisely the kinds of concerns that the Supreme Court recognized in Loving as based in fundamentally racial bias. Now, the problem here, in part, is that there was no further questioning, no questioning at all with respect to three of the four veneer members who expressed these views. And so — Kennedy, what Virgil tells us, and you're probably about to quote it, and I'm not trying to preempt it, when Judge Higginbotham wrote a very thorough opinion, and he says that the problem here is not only what we know, but what we don't know because of the further questioning. But we all — but that runs up against not that opinion, but that concept in the application runs up against the problem also of decisions being made by counsel. And they aren't generally explained, but trial decisions, tactics, and whatever. And there was some — isn't there some information from Haygood in his affidavit or otherwise that he didn't want to pursue this in a more direct way? He does say that in his second affidavit, which of course is diametrically contrary to the first affidavit he submitted in which he said there was no intentional strategy, I just simply didn't ask. What we know here is that the jur — these questions were posed to the jurors in — to the veneer members in the first place precisely because the interracial dynamics of the facts of this case were so palpable that it was — it was recognized that this was an important question that needed to be asked. So it's not a reasonable strategy to then say, well, I don't want to inject race into the discussion. Race was already injected into the discussion, and these jurors gave extremely troubling responses that precisely for the — I haven't looked at the questionnaire. Is that where it gets injected? Why at the time of jury selection are you saying that it was that thoroughly and — you didn't say thoroughly — that much injected? Because it was in the — in the questionnaire. The question starts out by explaining that there was this interracial relationship. Being this particular question, not an array of questions, but this question. There were — yes, in these questions. On interracial merit. There were three consecutive questions, one asking generally, do you belong to a religious institution that has views about this? Do you agree with those views? And then what are — and then the box-checking question, which was prefaced by an explanation of the factual dynamic in this case. Do you know off the top of your head which boxes — the two jurors that actually ended up on the Petit jury, were they Coleman and — There were three jurors that actually — One was an alternate, though. A fourth juror was an alternate. The three who sat were Ulmer, Copeland, and Armstrong. Ulmer — And put aside Ulmer just for the sake of argument. The one that had no — the other two, had they — when you're talking about the box-checking, were the other two ones that checked mild preference, personal view, or were either of them the vehement — They didn't check the vigorous opposition box. Who checked that? Ulmer checked — Ulmer was the one who checked that. The other two jurors checked, I oppose it, but I try to keep my views to myself, and then went on to explain in their written comments, in Mr. Copeland's case, he thinks the We think that's just as troubling as — as the checked box of vigorous opposition and not afraid to say so. And one reason why — why that's so troubling and why other sort of more generic assurances of fairness that the jurors might have given in response to other questions were not adequate, and that's because, in part, as the Supreme Court recognized in Turner v. Murray, in a capital case where the sentencing proceeding will require the jury to make a holistic moral assessment of the defendant's character and moral culpability to ultimately decide, is this a defendant who deserves to die? As the Supreme Court recognized, that is a process of deliberation where racial bias has a unique opportunity to operate undetected. And so that's why the Supreme Court has recognized, as this Court observed in Virgil, that the seating of a juror like this is structural error that requires reversal and perforce establishes prejudice for purposes of — of Strickland ineffectiveness. The — the State court here, the sole reason that the State court gave for rejecting this claim was because, as the State court saw it, there was no proof that the jury's verdict was actually motivated by racial discrimination. But as Virgil and the cases it cites make clear, that is not the correct standard. That's — that's contrary to clearly established law, which makes clear that this is structural error that necessarily renders the proceeding unreliable and fundamentally unfair. And — and particularly here where the facts of the case involved an interracial relationship between the black defendant and the white victim, the — the racial dynamics here were — were palpable and obvious. And for counsel to hear — see the jurors give these statements and then to do nothing, to take no response whatsoever, whether to move to challenge for cause, to exercise a peremptory strike, or at least to question them, it was unreasonable. Particularly where — I know Mr. Haygood, one of the points that he makes in his second affidavit is, well, I needed to be worried about whether there were other worse jurors. I would suggest that, you know, reading through the veneer — the voir dire doesn't — doesn't bear that out. But most importantly, Mr. Haygood concedes, and the State court made a factual finding, that the defense did not exhaust their peremptory challenges. And so it's simply not a plausible explanation to say, you know, I needed to be sparing with my challenges here. If he didn't want to make accusations to jurors, he could have used some of those strikes and should have done so here. And they say in this case — What we're doing here, as you have focused us on, is basically reviewing the reasoned trial State court decision, which is the State district court decision. And there are four findings that the Federal district judge highlighted from that State trial court decision. One is no evidence of effort by the prosecution to discriminate in the choice of jurors. It seems like the issue of the jury shuffle, is that what it's called, has dropped out of the argument. That's correct. Strickland encompasses the prohibition against counsels being second-guessed on their decisions, and you say the evidence was overwhelming, that he didn't have any — Hagood did not have any plan, but he does have an affidavit that says he did have a plan and was not trying to accelerate the focus on this or to increase the focus on this. And there's a presumption in favor of effective trial counsel Vordaer questioning. I mean, the problem with this case, it seems to me, is you have an awful lot of very troubling things that you are pointing out to us, and not just that you've shown to us today. I mean, so far, you've got more. But this has been looked at by three other courts, and the most important one is the State court. And there are responses to all of this. And what would you say is the right way to characterize what we are doing under EPA to rule in your favor on this issue? So with respect to this issue, there are, I think, a couple of routes, or all of which I think are well-founded. All roads lead to the same place, huh? Your Honor, with respect to the 2254-D1 standard, as I've already pointed out, the State court applied a standard that was contrary to clearly established law. This Court's decision in Virgil makes that clear. When the State court said that the test here is whether there's been proof of purposeful discrimination by the jury, that that's what's required for the Sixth Amendment and due process claim, that's contrary to the State court. The finding was made by the district State court. Are you saying somewhere in all that he's saying it's a prerequisite for relief? That's the explanation that the State court gives for denying relief on that claim is that Mr. Thomas had failed to prove purposeful discrimination by the jury and had failed to submit evidence that the verdict was racially motivated. That's not the test, as this Court made clear in Virgil. With respect to reliance on Mr. Haygood's affidavit, we think that was both an unreasonable application of Strickland and also an unreasonable determination of the facts in light of the evidence. And I think it's important to spend a little bit of time talking about Mr. Haygood's second affidavit, because it is utterly incredible for any number of reasons, many of which actually pertain more to the mitigation issue, which I don't want to pretermine the discussion on this one, but maybe I'll get there because of the importance of the Haygood affidavit. Mr. Haygood, in support of the State writ application, he swore under penalty of perjury to certain things that Mr. Thomas relied on. Six months later, he signs this second affidavit, which in almost every respect is irreconcilable with his first one. And there are many statements in there that we know to a mortal certainty are not believable because they contradict the trial transcript itself. I'll start with part of what Mr. Haygood says about his preparation for the mitigation investigation. I think it's important that you get to both points that you want to make. And I've asked you a question and you're trying to respond to it. I don't want to drag us too long into this issue. A suggestion to you so that you can get to the other point is just give me a quick summary of where you're headed and let's move on so you can cover your other point. Sure. Well, no, this isn't taking me off course because I think this goes to the heart of both of these issues. Right, but you're — Mr. Haygood, his second affidavit is, I think, the only read that the State has to stand on here, and it is not believable. Number one, Mr. Haygood tells in his second affidavit a detailed vignette about how he thought that Mr. Thomas' aunt, Doris Gonzalez, was going to be his primary witness. He also talked to two brothers and the father. They did really well when he interviewed them, but then on the stand, despite his best efforts, they fell apart and he abandoned their questioning. That entire story is 100 percent irreconcilable with the trial transcript, which reveals that Mr. Haygood never questioned or put on any of those witnesses. Two of those witnesses were called by the State, not by the defense, and it was Ms. Peterson who conducted their cross-examination. The other two witnesses were put on by the defense, but again, it was Ms. Peterson who conducted the questioning of them. Mr. Haygood is not in the picture. In fact, throughout the entire penalty phase, Mr. Haygood questioned only one of the nine defense witnesses and only five of the 20 prosecution witnesses. So the story that he spins in his second affidavit about the deep strategic thinking that he was doing in preparation for mitigation is simply unbelievable when we look at the trial transcript and what actually happened. He says other things like, I didn't want to put on humanizing evidence of Mr. Thomas's background and mental illness and struggles with substance abuse because I was worried that the jury might view that as supportive of future dangerousness. Well, if that were true, why then did he make that the central theme of his opening and closing arguments to the jury at the beginning and the end of the penalty phase? Those are just a couple of examples of things in that second affidavit that simply do not add up. And to the extent the State court credited that affidavit, it was 100 percent unreasonable in light not only of the contradictions between Mr. Haygood's first and second affidavits, which, you know, this Court probably sees that in a certain number of cases, but this affidavit is also contradicted by every other member of the defense team's affidavits and by the trial transcript itself. So once we take the second Haygood affidavit off the table, it leaves no strategic justification for failing to take any action in response to these jurors' statements of bias, and it takes off the table any explanation of reasonable strategy for the failure to investigate on the mitigation case. Now, with respect to mitigation, it's uncontradicted in the record that toward the end of the guilt phase, Ms. Peterson, who thought that Mr. Haygood was handling punishment all along, finds out all of a sudden that he hasn't done this. He says to her, who do we have for punishment? She then — Well, that's how you characterize it. His affidavit, the one you, I think, don't discredit as much, says that he had been working on the punishment phase, whatever he had to show for it or not, but he does dispute the interpretation that Peterson gives to his statement. He says, and the State court credits, that he spent many months preparing all aspects of the case. Specifically with reference to the punishment phase, he says — If I'm remembering correctly, that's what he says. I had the punishment stage. Peterson had the guilt. In the first affidavit, he agrees that that was the division of labor. Ms. Peterson agrees that was the division. Ms. Peterson's assistant, Leah Estep, agrees that was the division of labor. Everybody agrees that's what was going to happen. And then toward the end of the guilt phase, Mr. Haygood, as reported by Ms. Peterson and Ms. Estep, says, hey, who do we have for the punishment phase? We then see the evidence in the Peterson affidavits, the Estep affidavits, and contemporaneous email traffic showing that they are scrambling over the weekend between the conclusion of the guilt phase on Friday and the commencement of the penalty phase on Monday, scrambling to put together a mitigation case. Mr. Haygood did hire a mitigation specialist in September of 2004, a few months before the beginning of trial. But it is uncontradicted in the record that he met with her only twice, once for half an hour to give her a general overview, once to have lunch, in which she reports, we barely talked about Andre Thomas at all. She didn't prepare a social history report because counsel never told her to. That's one of the hallmarks that the Supreme Court recognized in Wiggins as something that is prevailing professional norms calls for. The Supreme Court recognized . . . What is the legal significance that we should give, and what do you base that on, that there was not such a report? I mean, there are disagreements with what is done less than an optimal presentation is almost always made, except today by counsel, but in trial courts. And you don't get relief because some things that are good to do weren't done. So what particular weight does that family report have in our analysis? I think it is one item on a very long list of respects in which counsel's investigation was utterly deficient. I note it because the Supreme Court highlighted it in particular in the Wiggins decision as one of the steps that prevailing professional norms calls on counsel to do. But it is certainly not the only thing. I already mentioned the fact that they were scrambling to prepare over the weekend. Of course, in Williams v. Taylor, the Supreme Court encountered a situation where counsel spent a week preparing, and the Supreme Court said, that's unreasonable and granted relief under AEDPA. They did engage an expert witness who was Kate Allen, who was the social worker. Both her testimony and her affidavit further make clear that, you know, they hired her I think a couple weeks before the penalty phase began. They decided the Monday night of the first day of the penalty phase that they were going to call her. She drives to Sherman that night, prepping on the phone with Ms. Peterson for her testimony on Thursday, where the prosecution is able to dismantle her testimony by pointing out, among other things, that she had only ever even met Mr. Thomas in an interview the day before, during which she took no notes, took no report, and in fact had hardly reviewed a fraction of the record materials that counsel should have had her prepare. All of this added up to a penalty phase in which the jury saw an incomplete and misleading picture of Andre Thomas' life. If they had conducted the investigation they should have done, what the state habeas record reveals is that the jury would have seen a completely different picture of Andre Thomas' humanity and moral culpability, and there was some suggestion by the district court that the evidence would be cumulative, and that's simply not the case. And there are, I think, three particular categories of evidence that are in the state habeas record that are different in degree and kind from what was before the jury. In particular, there was evidence of Mr. Thomas' struggles with mental health from a very young age. Now, of course, throughout the guilt phase his mental state was a major issue to the jury, but the evidence there was all focused on what was his state in the months and year or so before the murders. What the mitigation case would have shown is that as early as the age of nine, Andre Thomas was struggling, he was hearing the voices of demons, demons who were telling him to do things and that it scared him. This was a picture of a little boy who needed help, but instead of help and treatment, the record shows that what he received instead was significant neglect and abuse. Just because your time is running out, of the five claims you're making, how many of them involved the state court findings of procedural default? And separately, how many of them involved the district court, federal district court, saying that fair-minded jurists might disagree? And what's the relevance of the district court having said that? There are no — we have not raised any issues in this Court that the state court found a procedural default on. The district court reviewed all of them. Even the competency issue? That's — that's the ineffectiveness with relation to competency. We are not raising here a straight-up competency claim. That claim was, you're correct, procedurally defaulted. But the ineffective assistance claim was presented to the state court, which rejected it in reliance on a standard that is contrary to clearly established law, because the court there said in order to raise competency, there had to be certain factors. I think they said history — recent history of bizarre acts and mental illness. I mean, it's the wrong standard, but, frankly, we think it's a standard that was palpably met here. But in any event, it was the wrong standard. So we've raised that as an ineffective assistance claim. All of the claims that we've raised were adjudicated on the merits by the state court, and the district court addressed them subject to 2254D. The one exception — I hope you are concerned that your time ran out. But regardless, keep answering the question. I was just going to — just to put a last note on that. Please finish answering the question, but I don't want it to be seen to be inconsequential. Of course. The one — the one footnote on that is with respect to our Eighth Amendment claim, where for the reasons we explained, we think the Supreme Court's decision in Montgomery v. Louisiana removes the Teague and 2254 gloss, but — Can I ask for an answer? The other half of the question, if you're permitted, would be any relevance to the district court's conclusion that fair-minded jurists could disagree about several of the points. Well, we — we think that's wrong, but, of course, here we're only here for a COA, and so it's certainly debatable. But did he find that it was debatable at the same time as he denied it? I was unclear as to how you would interpret that statement. I'm — I'm reluctant to say no, because I suppose if he did, that would be helpful to us. But, honestly, I don't recall any point in the district court's opinion. Well, one example is that BAST defendant has only shown that fair-minded jurists could disagree about the correctness of the State's court's decision on one of the issues. Well, certainly, if there are places where the district court said that, that perforce establishes that a COA ought to grant on those issues. I mean, and I think that's sort of one that goes back to Your Honor's initial question about what would be the difference in the next phase would be focusing on exactly why. It's not a case where fair-minded jurors could disagree, but, in fact, a case where the State court's decision was unreasonable. All right, Kelsey. We'll see you again. Thank you. May it please the Court. I believe the first question was whether or not a COA should issue. Well, the question was supposed to be the basic procedure, as Buck reminded the Fifth Amendment, whether a COA should be granted based on that standard and then to deal with the merits perhaps in a separate proceeding. We were having oral argument and fairly lengthy briefing. It's not as if we granted a COA and now asked the State to respond. The response has already come in from the State in the reply brief. So just where are we if we decide reasonable jurists might disagree about any of this? Is more briefing required before we could turn to the actual merits decision? At this stage, the State, while the facts, as has been noted, are certainly disturbing and complex and some of these issues raise interesting questions, the State does not believe that the resolution of the legal issues is debatable. I understand that you don't think any COA is necessary. Okay. Where are we to grant a COA? Where would that leave the State in advising the Court on how to proceed? Well, we would certainly respond to whatever they have to say on their merits briefing, but if the Court was inclined to grant a COA, then the Court should grant a COA. If there are any issues that the Court ---- Is there any way to shorten the process? I guess I should be more direct. If we were to grant a COA, should we ---- do we have enough in front of us to turn to the merits and make that decision, too, without more briefing or more oral argument? I believe you do, and, of course, the Court has done that a number of times over the years, has held oral argument at the COA stage, determined the COA was warranted post-oral argument, granted COA in the opinion, and then ultimately denied the relief on the merits without further briefing. I just wonder if you think Buck may have changed the propriety of doing that. We will deal with it. That seemed to be a little bit what the District Court was doing, but that leads into the uncertainty I was asking opposing counsel about, even as to the juror, interracial marriage. Sure. The District Court did say fair-minded jurors could disagree. Wouldn't that largely encompass whether we grant a COA? To my way of thinking, it does. But, again, the State's ---- and our position right now is that no COA should issue. Well, how do you say that it does justify COA but still tell us we shouldn't grant it? The District Court can have its opinion about how it feels about the issues, and if it felt that a COA should issue on that particular claim, then it should have issued a COA. The State's position is that there is no entitlement to a COA. So your position is the District Court was wrong in that conclusion? Perhaps, yes. Again, if the Court felt that strongly, then they should have issued a COA. Well, related to that issue, on page 36 of your brief, you say, trial counsel extensively questioned all four regarding whether Thomas and Laura's race would impact their ability to remain impartial. You said all four indicated it would not. You didn't give a record cite. Is it your position that when I look at the transcript that trial counsel questioned Copeland and Armstrong as to whether or not their race would impact the ability to remain impartial? At this point, I have to admit that that was a mistake. That's a pretty significant mistake. It is, Your Honor, and if you — Why didn't you correct it? Because I did not catch it until — Until now? Far later. Well, whenever you caught it. I apologize for that, and I — in the future, if I catch such an error, I will correct it. I personally — I'm going to speak for the panel. That's inexcusable. If you're saying that you did catch it and you made a choice not to notice us that on that issue, until now you're apologizing? I don't believe it was a conscious choice not to notice the court. All right. I will say this, that my — Okay. Well, I have a few other questions about your brief. On page 41, the headings — could you read the — do you have the brief there? Yes. I'll wait. What is — this is a heading. Do you have it? Okay. Because Thomas was not competent, counsel were not ineffective. Is that another mistake? Yes, Your Honor. First not, I think. Well, that's another pretty salient mistake. You're telling us now you meant the opposite. It seems evident. Do you have that page in front of you that he's talking about? Yes. All right. And what do you say about the heading on page 41, is it, Judge? So just respond to what would you say now about what should the headings say. Thomas was not incompetent is what it should read. Okay. Well, then it's not just — I mean, it's not just little straight typographical errors. Pages 42 to 51 are a comprehensive set of arguments, including several about Doe-Bear. Yes. Is there any Doe-Bear issue before us in this matter? Your Honor, I was — when I was reading — I'm just asking you, is there a Doe-Bear issue presented to us in the COS? In the appellant's brief, they raised, according to their headings, five issues. Those five issues composed or were comprised of several multifaceted issues in the district court. When I was responding to the COA, I did the best I could with the way things were briefed, and I chose to go this route and cover all of the bases, if you will. If they say that there is not a Doe-Bear issue before this court, then there is not, and I apologize for the extra briefing. I was only doing — responding to their briefing, which mentioned, perhaps in a sentence or two or three, that, you know, in addition to all of these other mistakes that counsel made, counsel also did not make Doe-Bear challenges against each and every state's expert. Okay. And I felt it was my responsibility to respond to those claims, even though there wasn't a particular heading associated with that claim, if that makes any sense. Go ahead with your argument. Just return to wherever you would like to be. I think you've answered his questions. Okay. With response to — I guess I'll start with the juror bias claim, as that's where the appellant started. Several things jump immediately to mind. First of all, the State is not contesting that these jurors demonstrated a bias against interracial relationships in a questionnaire, in the jury questionnaire. We don't know where that question came from. We don't know exactly why it was in there, except for the fact that Andre Thomas is black and Laura Boren was white. Are you saying the record doesn't reflect how this questionnaire was put together? No, it does not. Answered one question versus another? It does not present — in other words, we don't know if the defense counsel asked for that question, if the prosecution asked for that question, if they asked for that question together, or if the trial court did it on its own motion. We don't know. That question is there. These jurors answered that question, and they answered it in a way that demonstrated they were biased against interracial relationships. On the face of that questionnaire and those answers alone, those jurors were not challengeable for cause. Were not. And I understand that counsel did not, for at least Copeland and Armstrong, conduct a more probing voir dire to find out if they could have been challengeable for cause, but at this point on this record, including the post-conviction record, there is absolutely nothing to demonstrate what answers would have been given had they been asked for the questioning. What do you do with Virgil? Because it does seem to me that Judge Higginbotham took us maybe in a place we didn't have to go, but we went there in that case, that made it relevant under Strickland that we don't know enough because of the ineffectiveness of counsel, and so we had this issue there that wasn't explored, and all we knew in Virgil is that someone was concerned because she had a relative who was in law enforcement. Someone else was concerned about something similar. Well, maybe not similar, but a mugging of a criminal victim and her mother. But that by itself was enough for the court to decide the failure to pursue that and to find out how serious it was, the intensity of that problem was enough to grant relief. So how is this different? This is different because Virgil involved express statements in which there were zero follow-up questions. What do you mean by express statements? Express statements of bias. Express statements in the courtroom, on the record, and the trial attorney said, the juror would say, I can't be fair. The attorney would say, I have no, there's nothing else I have to ask. Thank you very much. Well, what's expressed here is I don't like interracial marriage. That's at least a starting point. It's a certainly different starting point. It is. This is a clear statement of not liking what that defendant did in a racial context. Yes. Mr. Hagood explained in his affidavit, the one that was credited by the trial court, the trial court that was the same trial court that oversaw the trial, the voir dire of the trial and the state habeas proceedings, stated in his affidavit, he stated two things that I think are important here. One, that as unseemly as the statement is, he doesn't like to ask those questions because it can cause jurors to withdraw further and you will not give truthful answers. This is the same explanation that this Court accepted in Sterling, which is in my 28J letter. But he was willing to ask, I guess it was Hagood, was willing to pursue it with Olmer. And I don't know if it was in that order where Olmer came first and the others came thereafter. So that doesn't quite line up in the way that it says. I'm sorry, Your Honor. I feel like it does a little bit, at least because Olmer was the most vehement of the three that we are concerned with. On the questionnaire? Excuse me? His views on the questionnaire were the strongest? Yes. And he answered the question. He responded to Baudire and said that he did not, basically his answer was, I don't care who you murder, murder is murder and you have to accept the consequences for your actions. Of the other two, it's true that counsel did not get into those questions. They did ask the generalized questions, but those, Copeland and Armstrong were, I guess the word that had been used before was milder in their expressions. And the Supreme Court itself has recognized that delving into racial bias can cause problems. And to go a little further down that road, yes, this is an interracial crime. There is a black man killed a white woman, but that is not at all the crux of this case. The crux of this case was a marriage that went south, and when it did, Mr. Thomas could not accept that fact. Mr. Thomas killed his wife because she would not come back to him. It had absolutely nothing to do with her race or his race or anybody else's race. It was all about revenge and obsession. Well, it seems like the State admits and certainly the defense insists that the defendant was psychotic. Yes, absolutely. On what basis? So you're saying that this was a revenge killing or whatever the right label for that is. It does seem to be missing the greater point that even you acknowledge that this is a matter of a person who was psychotic at the time. Well, I'm not saying that you can't be psychotic and have a revenge killing, but what I'm saying, Your Honor, is that this Court and the district court acknowledge also when it addressed this issue is that in two other cases, Moore v. Maggio and Pryor v. Stevens, this court has recognized that when a trial is not attended by racial animosity and when there is no evidence that the race of the defendant or the victims played a role in the offense, the trial attorney is not deficient in this area. And there can be no ---- I think that's not exploring with random or every juror what is your feeling about racial issues. Was that in a context in which there was such as a questionnaire or through some other means there was actual concern about a few individual jurors who were expressing objections to certain racial points? It seems to me that's a much different situation if you're just talking about case law that generally says there's no obligation to get into questions about race in the usual situation. But here we have three very specific jurors. Well, they were cases that involved interracial crimes. I don't know specifically if they involved racial bias. Let me ask you this. If this is in fact evidence of racial bias in the way that racial bias is considered to be relevant, and I say whether it is or is not is one of the decisions that we would have to make, is this removed from actual bias against an African-American but an objection to a relationship? But if it is a racial bias evidence, is it ever enough just to ask a juror, without getting into the actual thoughts about race or whatever else, just to ask can you be fair? And that's all that really was done as to the other two jurors besides Ulmer, the other two who served. Is that ever enough if it's a racial bias situation? If this is an actual racial bias situation? If it's a situation that falls within the case law dealing with racial bias, as opposed to one that's, as you have argued, is not in that category, that is not evidence of racial bias from the questionnaires which you said early on. But if we say that it is, is it enough for Haygood to have asked can you be fair? If we were talking about a case of actual prejudice, actual racial bias under the case law, I would probably have to say it's not enough. Okay. I appreciate your candor. I think that is the law. I just wanted to say if you would argue it differently. Proceed. Opposing counsel made light of Mr. Haygood's affidavit regarding the much worse jurors, and I think that is. That's a kind way to put it. Made light of it? Anyway. Made light of that explanation. I believe that explanation was under these circumstances in this case, I believe that was a pretty good one. As I said, racial bias, or the fact that we had an interracial marriage here, was probably at the bottom of the pile for their concerns. Their concerns started with high publicity. Andre's arrest, his confession, the facts of the crime, all of these things were on the news and on the TV. Many jurors came into the courtroom and announced without provocation or hardly any provocation from the trial court that they would find him guilty right now. He was already guilty, and he should be hung yesterday. We don't have a change of venue issue here, but was that thought in the original? As far as I'm aware, it's not in the record. So if it was, it's not there. We also have the other single biggest thing, the mental health issues. The NGI plea that trial counsel knew was going to be made, the competency to stand trial that may or may not be an issue. And you have a lot of jurors who have a lot of very strong feelings about mental health issues, and particularly mental health experts. There were jurors who wanted the defense to bring them every expert in the land. There were jurors who said, do not bring me a single expert because I don't believe a thing they have to say. There were jurors who wanted physical evidence of Mr. Thomas' insanity. These are jurors that are going to increase the burden of proof for the defense on the cornerstone of their case by a significant margin. There are jurors who were going to require him or wouldn't allow the presumption of innocence on either guilt, innocence, or future dangerousness simply because of the publicity because he had killed children. So you're just talking about there were other jurors that the defense wanted to avoid. They accepted these. There were more. There were definitely causes for greater concern in this case. Is the opposing counsel correct that they didn't use their peremptories in spite of this vast array of concerns? They used all but one, yes. So they left one on the table. They used 23 challenges for cause and 14 peremptories through the voir dire. And the 23 challenges for cause were pretty clear-cut, were extremely clear-cut. As this Court knows, deciphering why a trial attorney uses a peremptory challenge can be very difficult without explanation. And we don't have one here. But from my reading of the jurors that were stricken with a peremptory and or, even more importantly, where trial counsel was denied a challenge for cause and then a peremptory was used, it often revolved — every time it revolved around the burden of proof, whether it was the burden of proof on insanity, burden of proof on guilt-innocence, burden of proof on future dangerous — future dangerousness, or just generally the presumption of innocence. Mr. Arjun, let me take you a different direction, if that seems to be fine. Of course. An issue not discussed by your colleague on the other side, and that has to do with the handling of the involuntary intoxication, the use of an expert who was not fully qualified, they say, to testify as to the effect of DXM, or whatever the acronym is, the chorocedin active ingredient in alcohol in the system. It seems to me that this does fit pretty close to the John case, another Higginbotham opinion that sets some important law for us. And as I understand what Drone is looking at, when you have something as significant, in case there it's the trajectory of the bullet, could have been a ricochet, or was the person clearly trying to kill the person who died, you've got to do something about it. You've got to get a legitimate expert to testify. I am certainly given a short form of what that opinion is all about, and you can correct me anywhere you want to. But it seems to me we have that here, arguably, that there's no doubt of the killings, whether it's murder or not, and whether his capacity to commit murder is going to be a crucial issue in the case. So tell me where you are on this. Why is relying on somebody other than a legitimate expert in pharmacology, neuropharmacology, relying on somebody who himself says, however you pronounce his name, is saying that you should get a different expert for this, as I understand what the evidence shows now in the affidavit form. Why isn't this a drawn situation? Mr. Thomas was interviewed by half a dozen experts, both from the state and the defense, on the neuropharmacologist issue, as explained by the experts who rebutted this affidavit during the state habeas proceedings, his opinion had nothing to do with insanity. Their chief argument for having this man is to establish that there was no scientific basis for the state's theory that Andre Thomas was under a substance-induced psychosis when he committed these murders. The problem with that is that the DXM metabolism study would not have done anything for that, and in fact the jurors heard about DXM metabolism from one of the state's toxicologists during the trial. What you're saying is relevant, but I think it's not quite what I'm looking for. There's so much to cover on this, and let me get you to focus on a slightly different place. Okay. And it is, you're disputing the science that was stated in the affidavits post-trial, habeas affidavits. I'm asking at the trial itself not to have someone who could testify as to taking the lab results of how much was in the system the day after or whenever that was done, the actual almost undiscovered or such a low amount of the active ingredient, of the dangerous ingredient in quercetin, taking all that evidence to dispute the state's theory that he wasn't psychotic from natural causes. It was from voluntary causes. Not to have an expert on that is very much the problem that Drawn was identifying. Why didn't the defense need a better expert who could actually testify as to this science? I mean, you probably don't have time, but I will accept that you also will dispute that that science supports what the defense is saying, but don't they need an expert to deal with that? I agree. There was more than enough evidence to show that at least in the month preceding the murders, in the days and weeks leading up to the murders, that Mr. Thomas was pretty much high and drunk all the time, in addition to taking the DXM on at least three different occasions that we know about that are memorialized in the record. There was no testimony necessarily that the substances which triggered the psychotic episode were still in his system when he murdered his wife and child. Yes, there is testimony. Say that again. I didn't quite hear. Mr. Hague's affidavit, there is no testimony that the substances which triggered the psychotic episode, the combination of the DXM, the marijuana, and the Old 45, the malt liquor, were still in his system when he murdered his wife and children. There is some evidence a little bit later that there were metabolites, a little bit of evidence of THC in his system, but there's just not enough there to show one way or the other whether these drugs in such a potent form were still in his system. To my way of thinking, in other words, it doesn't matter if the drugs were still in his system at the time. What matters is that he had a psychotic break as a result of the drugs that were in his system in the 24 hours before the murders. That was the issue before the jury. Whether the drugs were still in his system is, I would almost say, irrelevant because many of the experts also testified that, yes, once these drugs even leave your system, and it may take some time, but once they're out of your system, you can still be psychotic and, in fact, you may enter into a permanent psychotic state. It will always be a substance-induced psychotic state, but you can always be psychotic. The experts all agreed on that. So whether yet another expert comes into the courtroom to tell the jurors about DXM metabolites and how much may or may not have been left in his system and what the metabolic rate of this was, I think is kind of irrelevant to the whole story. The question was whether he was insane at the time of the crime, and that involves a question of mental disease or defect, and then that involves the secondary questions of, was it voluntary or was it organic? And as I said, the state put on plenty of evidence that his consumption of all of these drugs, even though stopped at a certain point, could still render him psychotic, and, in fact, we have the evidence that it did, that it does. We have the evidence. You have evidence. Well, what I'm saying... There was contrary evidence, is what my question concerns, that the defense failed to produce. But... I don't believe the state — I mean, I don't believe the state — You don't think a fact issue could have been made and, therefore, all this is irrelevant, that your evidence was conclusive and there's no way the state, by what they have shown so far in the habeas proceedings, could have produced an expert to create a fact question? That is correct. I do not believe, Mr. Thomas, the addition of these experts, the neuropsychologists and the neuropharmacologists, could have produced a fact question. Proceed. You've got a minute left. What have you got? I've got a minute left. All right. On the experts, I think it is important to note that Mr. Haggad did search out other experts, perhaps not neuropsychologists and neuropharmacologists, but he did search out two other experts, and they both evaluated Mr. Thomas. Dr. Richard Rogers evaluated Mr. Thomas and indicated that he blew the top off questions about malingering, and Dr. Jay Crowder thought a psychotic break was substance-induced. So these are two experts that, once again, the defense had to cross off its list of people who could come in and testify to the specific issues before the jury, that is, insanity and the mental disease or defect and whether he knew what he was doing was wrong. And this leads to the point that the defense wanted to avoid, at all possible costs, having these opinions get in front of the jury, particularly the one of Dr. Richard Rogers. It was bad enough that there was already evidence of Thomas's malingering that several of the experts talked about, malingering and manipulation, but to have this expert's opinion become known I think would be even more damning. If I have a quick second on the ---- I don't think you have time to tell us anything. Okay. We have your brief. Okay. I will stand on my briefing for the ineffective assistance claim, the mitigation claim. Thank you, Your Honor. Ms. Sargent spoke about the crux of this case. The crux of this case was whether Andre Thomas, who committed brutal murders amid what everybody agrees was the throes of active psychosis, whether he deserved to die for those crimes. That was the crux of this case. And all of the issues that we've raised pertain to the prejudice that he suffered on that fundamental question as a result of counsel's errors. With respect to juror bias, I spoke earlier about the Supreme Court's decision in Turner and the effect that undetected racial bias can have on the holistic moral judgment that the jury has to make in the jury room. And Ms. Sargent pointed out correctly, we agree, that because of the failure to question, we have no idea the depth or intensity of the jurors' views and how they might have affected their evaluation of Mr. Thomas's character and his moral culpability. There was some discussion about Mr. Haygood's strategy, again referring to what was going on with all of the other jurors. But reasonable strategy, to be reasonable, a strategic decision must be informed. And having failed completely to question two of the jurors and to question inadequately the third, Mr. Haygood had no basis to make a conscious, informed decision whether to challenge or use a strike on those jurors. Did the State court describe this as a conclusory claim? And if so, how does that make sense? I don't believe they described it that way. I might be misremembering. But if they did, it certainly wouldn't make sense because we think it's a meritorious claim. So conclusory in that there isn't enough development of the record to know. I think there was some characterization, I think, by the district court, not by the State court, that the assertion of bias was conclusory in the sense that it rested solely on the boxes checked and the statements written in the questionnaires. That's what comes to my mind about what was supposedly conclusory. But I think for the reasons that have been discussed, the bias that was there was one that went straight to the heart of the factual dynamic of this case. And, again, because of the failure to question, as this Court observed in Virgil, we can't know, and that's part of what renders the proceeding unreliable when you don't know how this might have affected the jurors' evaluation of the case. And just for the record, the point about exhausting peremptories is at page 2133 of the ROA, where the State court makes the finding not only that the defense did not exhaust their peremptory strikes, but that the court would likely have granted them more if they did not exhaust their peremptory strikes at page 2133. And what is that document? I'm sorry. That's the State court's findings of fact. Judge Southwick, Your Honor brought up one of our other issues, which is the failures with respect to their conduct of the experts. Just for the record, we don't have a doubter issue in the case, but we do, of course, raise the point that ---- Well, you do say in your briefing, and I think in fairness to Ms. Sargent, you do say in your briefing that Haygood didn't even question their credentials, didn't take them on some sort of order. I think, if I may use the word pronunciation, Dalbert, despite my learned colleague here, whatever you call it, I think that's sort of getting close to that point. That's fair enough. I think what we've really focused on there is what Your Honor's questions drew out, which is in a situation where Mr. Haygood, who had claimed responsibility for preparing the expert presentation, we know that he understood that the real fight in this case was about the cause of the psychosis. We know that he knew that the experts he had were not qualified to opine on that. We know because Dr. Harrison and Ms. Shada and even the prosecutor suggested to him that there might be other experts who could attest to that, and yet Mr. Haygood failed to investigate, failed to uncover those other experts. And the result, you know, with respect to the affidavit of Mr. Lippman, it's not just a metabolic study. He goes on from there to discuss how the symptoms and behaviors that Mr. Thomas demonstrated were not consistent and were, in fact, distinctly different from the known toxicity of DXM. So it's not just the metabolic study. Well, I looked at the testimony that was actually introduced by the psychiatrist, and he does make the statements, it seems to me, that you want made, that not made with as much expertise and he gets into trouble on cross-examination. But nonetheless, the jury did have in front of it a professional statement that this cannot be the explanation, the State's explanation. Isn't that correct, despite whatever qualifications you might want to put to that? Wasn't the jury told that the State's theory is scientifically hogwash? May I respond? Oh, please. Yes, and what Mr. Haygood tells us in his affidavit, even consistent with his second, is that he knew that Dr. Grippon wasn't fully qualified to give as forceful of an explanation on that point as he otherwise might have wanted, and that he therefore had to restrain his questioning on that point. And this goes also to the mitigation issue as well, because ultimately, as Ms. Sargent suggested, what we had here was a fight about what was the cause of the psychotic break. And what the jury saw from the prosecution and from the failures of the defense counsel was a situation where Mr. Thomas, as a result of his drug abuse, suffered a psychotic break right before the murders. What they should have seen and what would have gravely affected their evaluation of whether he deserved to die was that as a little boy, he was suffering the effects of this organic mental illness. He needed help. He never got it. And all of that, the bias, the failures on the experts, and the utter failures to prepare a mitigation case, clearly prejudiced the ultimate decision on sentencing. And with that, I would just close by just for the sake of clarity, since I don't think I was very clear the first time. We would be more than happy for the Court to go on to a decision on the merits. Obviously, happy to submit further briefing if the Court would find it helpful. But I just wanted to say that. Happy to return for oral argument? Pardon me? Happy also to return for oral argument? If the Court would find it helpful. We shall see. Thank you both and all who have come for this. It's certainly an important set of questions for us to resolve. We are in recess. Thank you.